UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

RICHARD A. FOX,                        )
                                       )
            Plaintiff,                 )
                                       )
      v.                               )     No. 2:19-cv-00150-JPH-MJD
                                       )
KEVIN HUNTER, et al.,                  )
                                       )
            Defendants.                )

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Richard Fox, who is incarcerated by the Indiana Department of Correction ("IDOC"), was confined in restrictive housing at the Wabash Valley Correctional Facility ("WVCF") from August 2017 through December 2018. During that time, he was held in Disciplinary Restrictive Status Housing ("DRSH"), Administrative Restrictive Status Housing ("ARSH"), and the Restricted Movement Unit ("RMU").[1] He alleges in this civil rights lawsuit that the defendants, Randall Purcell and Kevin Hunter, violated his due process rights by failing to provide him with meaningful classification reviews during his time in restrictive housing. Mr. Fox and the defendants have filed motions for summary judgment. Dkt. 142, 145.

There are disputes of fact regarding whether the time Mr. Fox spent in segregated housing and the conditions he experienced there implicated his due

---

[1] Mr. Fox refers to ARSH and DRSH generally as "segregation" and all three units as "restrictive housing." The Court will also use this terminology.

process rights. There are also disputes of fact regarding whether Mr. Fox was provided adequate classification reviews. Therefore, the cross motions for summary judgment are **denied** as to Mr. Fox's claims against Mr. Purcell.

However, it is undisputed that Mr. Hunter had no personal involvement in Mr. Fox's classification reviews when he was in segregation and that, while Mr. Hunter was the Unit Team Manager over the RMU, Mr. Fox's time there did not implicate his due process rights. Accordingly, the defendants' motion for summary judgment is **granted** as to the claims against Mr. Hunter, and Mr. Fox's motion for summary judgment as to these claims is **denied**.

## I.
## Standard of Review

Parties in a civil dispute may move for summary judgment, which is a way of resolving a case short of a trial. *See* Fed. R. Civ. P. 56(a). Summary judgment is appropriate when there is no genuine dispute as to any of the material facts, and the moving party is entitled to judgment as a matter of law. *Id.*; *Pack v. Middlebury Cmty. Schs.*, 990 F.3d 1013, 1017 (7th Cir. 2021). A "genuine dispute" exists when a reasonable factfinder could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Material facts" are those that might affect the outcome of the suit. *Id.*

When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572-73 (7th Cir. 2021). It cannot weigh evidence or make credibility

determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The Court is only required to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it is not required to "scour every inch of the record" for evidence that is potentially relevant. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 573-74 (7th Cir. 2017).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). "[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

When reviewing cross-motions for summary judgment, all reasonable inferences are drawn in favor of the party against whom the motion at issue was made. *Valenti v. Lawson*, 889 F.3d 427, 429 (7th Cir. 2018) (citing *Tripp v. Scholz*, 872 F.3d 857, 862 (7th Cir. 2017)). The existence of cross-motions for summary judgment does not imply that there are no genuine issues of material fact. *R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Engineers, Local Union 150, AFL-CIO*, 335 F.3d 643, 647 (7th Cir. 2003).

## II.
## Factual Background

Because the parties have filed cross-motions for summary judgment, the Court takes the motions "one at a time." *American Family Mut. Ins. v. Williams*, 832 F.3d 645, 648 (7th Cir. 2016). For each motion, the Court views and recites the evidence and draws all reasonable inferences "in favor of the non-moving party." *Id.* Here, however, most of the material facts are undisputed, as follows.

### A. Mr. Fox's Placement in Restrictive Housing

Mr. Fox was incarcerated at WVCF from approximately 2012 through 2021. Dkt. 143-1 at 9:11-13 (Fox Dep.). In August 2017, Mr. Fox was placed in DRSH based on a conduct report. *Id.* at 19:11-25; 23:7-13. He remained in DRSH until December 26, 2017, when he was moved to ARSH. *Id.* at 17:14-18. He remained in ARSH until June 27, 2018, when he was transferred to the RMU. *Id.* at 29:3; 53:16-19. Mr. Fox stayed in the RMU until December 4, 2018. *Id.* at 72:3-14.

### B. The Housing Units

DRSH and ARSH are segregated units where inmates live alone in their cells, while inmates in general population units typically have a cellmate. Dkt. 146-2 at 18:24–19:2, 20:10–14 (Purcell Dep.). The doors of segregation cells are mostly solid, with only a slot for food trays and small holes for ventilation. *Id.* at 19:22–20:9. Meals are served through the slot in the cell door and eaten alone; inmates in general population can socialize over their meals. *Id.* at 25:12–23. In addition, inmates in segregation are alone in their cells approximately 23 hours

4

per day. Dkt. 146-2 at 21:8–15. When inmates in the segregated units do leave their cells, their wrists are handcuffed behind their backs, and a lead strap is attached to the chain of their handcuffs, unlike inmates in general population. *Id.* at 17:18–18:11. Inmates in the segregated units are allowed only three showers per week. *Id.* at 24:6–11. They do not have access to educational programs, and the only job available is sanitation. *Id.* at 26:20–27:15, 28:3–6. Recreation in segregation consists of approximately one hour alone once a day in a square box with chain link fence on the sides and ceiling and a concrete floor. *Id.* at 21:23–24:5. Inmates in segregation can use the phones once per week. *Id.* at 26:12–19. And unlike the inmates in general population units, inmates in the segregated units cannot have any physical contact with visitors. Dkt. 143-4 at 10:7–18 (Hunter Dep.).

Inmates in segregation and the RMU also cannot visit the law library and can only receive information by mailing a request to the law library. *See* dkt. 94 at 5; dkt. 146-2 at 28:17–29:7; dkt. 146-4 at 4. But inmates in the RMU have a cellmate, outside recreation, and contact visits. Dkt. 143-4 at 9:18-10:6. They are confined to their cells unless allowed to leave by prison officials. Dkt. 146-4 at 3. In the RMU, inmates cannot go into another inmate's cell, and their movement is "closely monitored." *Id.* at 5.

### C. Reviews of Mr. Fox's Placement

Mr. Purcell was the casework manager over ARSH. Dkt. 143-1 at 27:1-18. His responsibilities included conducting monthly reviews for inmates. Dkt. 143-2 at 29:12-15. Those reviews were based on recommendations made by his

superiors and colleagues in various departments within the IDOC, including the office of internal affairs, the warden, the deputy warden, and the conduct adjustment board. *Id.* at 37:16-38:8. Mr. Purcell explained that those reviews could change based on the information he received from these other prison officials. *Id.* at 43:6-18. But, while Mr. Purcell would consider internal affairs recommendations, he did not report to individuals "higher up" than him on how inmates were doing while in segregation. Dkt. 143-2 at 39:9–12. He did not have the authority to release anyone from the ARSH. *Id.* at 43:16-18. His review decision would change if he received an email stating that Mr. Fox had "spent enough time in administrative restrictive status housing." *Id.* at 43:12-14.

When Mr. Purcell performed 30-day reviews, he would type the inmates' names, IDOC numbers, and cell locations into a form and print all the inmates' reviews at the same time. *Id.* at 30:21–31:5. Mr. Purcell rarely took more than ten minutes to complete the reviews for the entire unit. *Id.* at 34:5–12. He would create a written review form and give it to the inmate. *Id.* at 36:17-20. Each review Mr. Fox received while in ARSH included the same language except for the date of the review, stating:

> Per order of the Warden, Offender Fox, Richard, DOC # 883999, is currently assigned to the Secure Confinement Unit at the Wabash Valley Correctional Facility.
>
> Your status has been reviewed and there are no changes recommended to the Warden at this time. Your current Administrative Restrictive Housing Status shall remain in effect unless otherwise rescinded by the Warden.
>
> This review was prepared by R. Purcell, Casework Manager, Secure Confinement Unit. If there are any questions regarding this

report, they may be directed to the Unit Casework Manager or Unit
Team Manager.

Dkt. 146-7. Mr. Purcell never discussed the content or outcome of the reviews

with any of the inmates; rather, the inmates would simply receive copies of the

reviews in their mail bags. Dkt. 143-1 at 34:13-24. Mr. Purcell was the only

individual who reviewed the outcome or content of the reviews before they were

delivered to the inmates. *Id.* at 35:16–18.

None of the reviews recommended any change in Mr. Fox's housing or

provided an explanation for this conclusion. *Id.* at 43:1–5. Mr. Fox did not know

how long he would be in ARSH, and he was not consulted as part of his review

or provided information as to his rights. Dkt. 143-1 at 39:8–15. The reviews did

not include any language regarding the process for appealing the outcome of the

30-day reviews. *See* dkt. 94 at 5; dkt. 146-7.

Mr. Fox was moved to the RMU on June 27, 2018. Dkt. 143-1 at 53:22-
25.

**D. Mr. Hunter**

Kevin Hunter was not a Unit Team Manager over any segregation units.

Dkt. 143-4 at 7:23-25 (Hunter Dep.). He was not involved with Mr. Fox's

placement in ARSH. Dkt. 143-1 at 33:11-12. Mr. Hunter knew that Mr. Fox was

cleared for transfer to the RMU on December 26, 2017, but Mr. Fox was not

transferred to the RMU until June 27, 2018. Dkt. 143-4 at 15:5-7. Mr. Hunter,

however, had no role in moving inmates from segregation to the RMU. Dkt. 143-

4 at 13:12-18.

**III.**
**Discussion**

Mr. Fox claims that his due process rights were violated when he was held
in ARSH without meaningful review. The parties have each moved for summary
judgment on this claim. In addition, the parties seek summary judgment on the
issue of whether Mr. Hunter was responsible for the alleged violations of Mr.
Fox's due process rights.

### A. Due Process

The Due Process Clause applies only to deprivations of life, liberty, and
property. *Isby v. Brown*, 856 F.3d 508, 524 (7th Cir. 2017). "Prisoners do not
have a constitutional right to remain in the general population." *Id.* (citing *Sandin
v. Conner*, 515 U.S. 472, 480 (1995)). Instead, a protected liberty interest "is
triggered only when the confinement imposes 'atypical and significant hardship
on the inmate in relation to the ordinary incidents of prison life.'" *Lisle v. Welborn*,
933 F.3d 705, 721 (7th Cir. 2019) (quoting *Sandin*, 515 U.S. at 484). In the
context of segregation, "both the duration *and* the conditions of the segregation
must be considered" in determining whether due process is implicated. *Id.*
(quoting *Marion v. Columbia Corr. Inst.*, 559 F.3d 693, 698 (7th Cir. 2009)
(citation omitted)).

### 1. Atypical and Significant Hardship

The parties disagree regarding the relevant time period to consider when
determining whether Mr. Fox's due process rights were implicated. Mr. Fox spent
a total of ten months in segregation and over a year in restrictive housing—

8

DRSH, ARSH, or the RMU. *See* dkt. 147 at 7. Mr. Fox contends that the entire time he was in restrictive housing must be taken into account when considering his due process claims, while the defendants exclude time spent in DRSH and the RMU and base their arguments on only the six months Mr. Fox spent in ARSH. *See* dkt. 144 at 4–5.

The designated evidence shows that the conditions Mr. Fox experienced in DRSH and ARSH were very similar and that those conditions were substantially more harsh than the conditions in general population. Unlike inmates in general population, inmates in both DRSH and ARSH live alone in their cells for 23 hours per day. Dkt. 146-2 at 21:8–15. Meals are served through the slot in the cell door and eaten alone. *Id.* at 25:12–23. When outside of their cell, inmates' wrists are handcuffed behind their backs, and a lead strap is attached to the chain of their handcuffs. *Id.* at 17:18–18:11. They are allowed only three showers per week, *id.* at 24:6–11, do not have access to educational programs, can only work in sanitation, *id.* at 26:20–27:15, 28:3–6, can use the phones only once per week, *id.* at 26:12–19, and cannot have physical contact with visitors, *id.* Recreation in segregation consists of approximately one hour alone once a day in a square box with chain link fence on the sides and ceiling and a concrete floor. *Id.* at 21:23–24:5. The conditions were also substantially harsher and more restrictive than the conditions in the RMU as inmates in the RMU have a cellmate, outside recreation and contact visits, and are not necessarily confined to their cells for 23 hours per day. Dkt. 143-4 at 9:18-10:6; *see Hardaway v. Meyerhoff*, 734 F.3d 740, 744 (7th Cir. 2013); *Hampton v. Brown*, No. 2:15-cv-135-WTL-MJD, 2017

WL 396193, at *3 (S.D. Ind. Jan. 30, 2017) (plaintiff's due process rights were not violated by his stay in the RMU because the conditions there "were certainly not inordinately harsh relative to the conditions of general population").

Based on the designated evidence, a reasonable jury could conclude that that length of time, combined with the conditions discussed above in segregation in ARSH and DRSH, triggered Mr. Fox's due process rights. *See Kervin v. Barnes*, 787 F.3d 833, 836–37 (7th Cir. 2015) (noting that a "considerably shorter period of segregation [shorter than six months] may, depending on the conditions of confinement and on any additional punishments, establish a [due process] violation"). On the other hand, a reasonable jury might conclude that his placement in segregation did not. *See Marion v. Columbia Correction Inst.*, 559 F.3d 693, 698 (7th Cir. 2009) (noting that a "lengthy" term of segregation still requires "scrutiny of the actual conditions of segregation" before finding due process rights were triggered); *see also Hardaway*, 734 F.3d at 744 (no liberty interest implicated where inmate spent six months in segregation with a violent cellmate and "was permitted to use the shower and prison yard once every week"); *Lisle*, 933 F.3d at 721 (finding inmate introduced no evidence that rust on bars of cell and "corroded feces" in the toilet were unique to cells in segregation or caused the plaintiff hardship); *Stallings v. Best*, No. 16 C 11063, 2018 WL 4300488, at *6 (N.D. Ill. Sept. 10, 2018) (collecting cases that hold that a six-month placement in segregation *with* pest infestations and unsanitary conditions does not implicate a liberty interest).

## 2. Classification Reviews

The defendants contend that, even if Mr. Fox's stay in segregation implicated his due process rights, he was given adequate classification reviews. On the other hand, Mr. Fox argues that those reviews were insufficient to satisfy his right to due process.

When due process is implicated, "[p]rison officials must engage in some sort of periodic review of the confinement of [inmates in administrative segregation]." *Hewitt v. Helms*, 459 U.S. 460, 477 n.9 (1983) (*abrogated on other grounds by Sandin,* 515 U.S. at 484). "This review will not necessarily require that prison officials permit the submission of any additional evidence or statements," but an inmate is entitled to "some informal, non-adversarial" procedures. *Id.*; *Westefer v. Neal,* 682 F.3d 679, 684-85 (7th Cir. 2012). Informal due process under these circumstances requires a periodic review of the placement determination at a frequency sufficient to ensure that "administrative segregation does not become 'a pretext for indefinite confinement.'" *Id.* (quoting *Hewitt*, 459 U.S. at 477 n.9).

The law does not require a statement of reasons for an inmate's retention in segregation, but the review must still be meaningful and non-pretextual. *Isby*, 856 F.3d at 527. "'[A] meaningful review . . . is one that evaluates the prisoner's current circumstances and future prospects, and, considering the reason(s) for his confinement to the program, determines whether that placement remains warranted.'" *Id.* (quoting *Toevs v. Reid,* 685 F.3d 903, 913-14 (10th Cir. 2012)). The crux of the due process analysis does not turn on whether the conclusion

11

was reasonable, but whether the review was meaningful. *See Isby*, 856 F.3d at 527.

Here, there is scant evidence in the record regarding the substance of Mr. Fox's classification reviews. The defendants point out that Mr. Purcell provided Mr. Fox with a monthly written review of his housing status in ARSH, and that those reviews were based on recommendations by other IDOC officials. Dkt. 143-2 at 29:12-15; 37:16-38:8. The monthly reviews could change based on information he received from these other prison officials. *Id.* at 43:6-18. But Mr. Purcell never reported on how Mr. Fox's was doing to those other prison officials. *Id.* at 39:9-12. In addition, each of Mr. Fox's reviews had the same, boilerplate language with no factual basis or rationale regarding his classification status or placement in ARSH. *Id.* at 40:13–42:21; dkt. 146-7. The entire review process for the ARSH unit took Mr. Purcell only ten minutes each month. Dkt. 143-2 at 34:5–12.

Based on these facts, a reasonable jury might conclude that Mr. Fox's reviews were not meaningful and therefore did not satisfy due process. *See, e.g.*, *Isby*, 856 F.3d at 529 (reversing summary judgment where a reasonable trier of fact could find reviews including "the repeated issuance of the same uninformative language" did not satisfy due process). Conversely, a jury might conclude that the reviews were sufficient and did not violate Mr. Fox's due process rights. *See, e.g.*, *Kimble v. Boughton*, No. 19-CV-645-SLC, 2021 WL 3809904, at *17 (W.D. Wis. Aug. 26, 2021) (noting repetitive recommendations to remain in segregation passed due-process muster when the inmate was "well

aware" why he was staying there). Accordingly, the motions for summary judgment are **denied** as to Mr. Fox's due process claim.

### B. Personal Involvement of Defendant Hunter

Mr. Hunter argues that he is entitled to summary judgment because he was not personally involved with Mr. Fox's reviews while he was in ARSH. Mr. Fox agrees that Mr. Hunter was not involved with those reviews but argues that Mr. Hunter knew that Mr. Fox had been approved to be moved from ARSH to the RMU for months yet did nothing to make the move happen.  Dkt. 147 at 13.

Mr. Fox argues that, because Mr. Hunter was aware that Mr. Fox had been approved for transfer to the RMU, he can be held responsible for his failure to ensure that transfer took place. In support of this argument, Mr. Fox points to *Richman v. Sheahan*, 512 F.3d 876, 885 (7th Cir. 2008), for the proposition that Mr. Hunter may be held liable because he could have prevented the harm that occurred but failed to do so. The *Richman* court explained that "the failure of a public officer to rescue a person threatened with harm by a third party is not deemed a deprivation of life or liberty without due process" but there is an exception to this rule when the officer creates the peril that causes the need for rescue. *Id.* Here, Mr. Fox has designated no evidence showing that Mr. Hunter caused Mr. Fox's extended placement in ARSH. Further, Mr. Fox has pointed to no evidence that Mr. Hunter had any authority to direct Mr. Fox's transfer and therefore has failed to designate evidence that Mr. Hunter was personally involved in the alleged deprivation of his rights when he was housed in ARSH.

13

On the contrary, the designated evidence shows that as the Unit Team Manager for the RMU, Mr. Hunter was not involved with the ARSH or the DRSH. *See* dkt. 146-3 at 7 (Hunter Dep. at 7:20–22). Moreover, he played no role with respect to reviewing Mr. Fox's placement in those units, dkt. 143-1 at 33:11-12. And while Mr. Hunter knew that Mr. Fox had been approved to be moved from ARSH to the RMU and the transfer had not occurred, dkt. 146-3 at 14:19–15:7; dkt. 146-8; dkt. 146-9 at 4, that's not enough to bring Mr. Hunter within the scope of potential liability for a constitutional violation based on Mr. Fox's time in DRSH/ARSH. Without any involvement in Mr. Fox's designation to DRSH/ARSH or reviews to determine whether he should remain in restricted status housing, Mr. Hunter cannot be held liable for the alleged violation of Mr. Fox's due process rights. *See Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017) ("[I]ndividual liability under § 1983 . . . requires personal involvement in the alleged constitutional deprivation").

Last, Mr. Fox argues that Mr. Hunter can be liable for violating his due process rights because he was the Unit Team Manager of the RMU during Mr. Fox's stay in the RMU from June 27, 2018 until December 4, 2018. Even if that is the case, however, Mr. Fox has not designated evidence to allow a reasonable jury to conclude that he was subjected to conditions in the RMU that triggered his due process rights. Unlike inmates in ARSH and DRSH, inmates in the RMU have a cellmate, outside recreation and contact visits, and are not necessarily confined to their cells for 23 hours per day. Dkt. 143-4 at 9:18-10:6; *see Hardaway*, 734 F.3d at 744; *Hampton*, 2017 WL 396193, at *3.

## IV.
## Conclusion

For the reasons discussed above, the defendants' motion for summary judgment, dkt. [142], is **GRANTED in part and DENIED in part**. Mr. Fox's claims against defendant Mr. Hunter are **dismissed**. Mr. Fox's due process claims against Mr. Purcell remain. Mr. Fox's motion for summary judgment, dkt. [145], is **DENIED**. Mr. Fox's motion for leave to file an amended statement of claims, dkt. [148], is **GRANTED** consistent with this Order.

No final judgment shall issue at this time. The Magistrate Judge is requested to hold a status conference to discuss the further proceedings in this case.

**SO ORDERED.**

Date: 4/24/2023

_James Patrick Hanlon_
James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

RICHARD A. FOX
883999
MIAMI - CF
MIAMI CORRECTIONAL FACILITY
Inmate Mail/Parcels
3038 West 850 South
Bunker Hill, IN 46914-9810

All Electronically Registered Counsel